Filed 10/21/14  In re Michael M CA2/2

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| In re MICHAEL M., a Person Coming Under the Juvenile Court Law. | B254598 (Los Angeles County Super. Ct. No. CK90409) |
| LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND FAMILY SERVICES, Plaintiff and Respondent, v. MARISSA M., Defendant and Appellant. | |

APPEAL from a finding and order of the Superior Court of Los Angeles County. Carlos V. Vasquez, Judge.  Affirmed.

Julie E. Braden, under appointment by the Court of Appeal, for Defendant and Appellant.

John F. Krattli, County Counsel, Dawyn R. Harrison, Assistant County Counsel, and Stephen D. Watson, Deputy County Counsel, for Plaintiff and Respondent.

_____

Marissa M. (mother) challenges the juvenile court's order terminating parental rights over her four-year-old son, Michael M. (Michael, born Sept. 2009).[1]  (Welf. & Inst. Code, § 366.26.)[2]  She contends that the juvenile court erred in finding Michael adoptable and by declining to require him to testify at the hearing to terminate parental rights.

We affirm.

## FACTUAL AND PROCEDURAL BACKGROUND

*Section 300 Petition and Detention Hearing; Placement with Ms. A.*

On October 20, 2011, the Los Angeles County Department of Children and Family Services (DCFS) filed a section 300 petition on behalf of then two-year-old Michael. The petition alleged that mother had a history of substance abuse and was a current user of methamphetamine, which rendered her incapable of providing Michael regular care and supervision.

The accompanying detention report indicated that DCFS had received a referral on October 17, 2011, alleging that Michael had bruises on his head, face, and ears.  The reporting party took Michael to the hospital, where he was observed to have black eyes and bruises to his head.

Mother, who was residing at a sober-living facility, told DCFS that Michael had sustained the injuries by falling in the bathtub.  She disclosed that she had only recently reunited with Michael; he had been detained from her custody the year before as a result of her overdosing on speed.  She told the social worker that she had used speed two days earlier and had a long history of using methamphetamine and heroin.

---

[1]    Michael's father is John K.  He is not a party to this appeal.

[2]    All further statutory references are to the Welfare and Institutions Code unless otherwise indicated.

2

At the October 20, 2011, detention hearing, the juvenile court detained Michael from parental custody and granted mother monitored visits. He was placed in the foster home of Ms. A.

*Placement with Amanda M.; Section 300 Petition is Sustained*

Michael reportedly threw tantrums and became angry when he did not get his way.

On December 19, 2011, Michael was placed in the home of his paternal aunt, Amanda M.

The following day, the juvenile court sustained the section 300 petition, declared Michael a dependent of the juvenile court, removed him from parental custody, ordered him suitably placed, granted mother monitored visitation, and directed DCFS to provide mother with reunification services.

*Interim Review Report; Placement with Raul and .C.*

DCFS filed an interim review report on March 15, 2012, noting that Michael had been placed with Raul and E.C. (E.) on January 18, 2012. [3]

DCFS also advised that mother had visited Michael a total of four times since he had been detained. The social worker monitoring the visits noted that it took "a while" for Michael to warm up to mother.

*Status Review Report; Six-month Review Hearing*

On June 19, 2012, DCFS reported that mother had visited Michael weekly since May 12, 2012, and that their interaction was improving.

Michael was developing age-appropriately, but had difficulty sleeping through the night. He threw tantrums, became aggressive, refused to eat or drink, had nightmares, and was often fearful. These behaviors usually occurred after visits with mother, and it took Michael days to calm down after a visit. E. said that Michael seemed to have "flash backs" of things that had happened to him, as he would cry, panic, and say that people had hit him. E. tried to soothe the boy, but his unpredictable behavior unsettled her.

---

[3] The record does not explain why Michael was removed from Amanda M.'s home.

Despite Michael's problems, DCFS reported that he was a healthy, adoptable child. He was making great strides in his behavior, and if reunification efforts failed, his permanent plan was adoption.

At the six-month review hearing, the juvenile court found mother in partial compliance with her case plan, found that mother had made significant progress in resolving the problems that led to Michael's removal, and had visited the child regularly. The juvenile court ordered additional reunification services and set the 12-month review hearing.

*Interim Review Report; Placement with Mr. and Mrs. V.*

As of July 27, 2012, mother had been visiting Michael for one hour per week since May 12, 2012. E. said that Michael had regressed since he began seeing mother consistently, as he would cry uncontrollably after visits. E. also said that Michael would share stories of physical abuse and provide names of people who had hurt him. In addition, Michael informed the social worker that mother and other people had physically hurt him.

On August 17, 2012, Michael was placed with new foster parents, Mr. and Mrs. V., because E. and Raul C. could no longer take the behavior he exhibited after visits with mother.

*Status Review Report; 12-month Review Hearing*

On December 18, 2012, DCFS reported that Michael was flourishing in his new placement. There were no behavioral issues to report, except that Michael would become distant and irritable after visits with mother. Mother had been visiting Michael for two hours on Mondays and Fridays. ) Mrs. V. said that Michael was a "joy" to have in her home, but she and Mr. V. were not interested in providing a permanent home for the boy.

At the 12-month review hearing, the juvenile court set a contested 12-month review hearing for January 16, 2013.

*Last Minute Information for the Court; Interim Review Report; Contested 12-month Review Hearing*

On January 16, 2013, DCFS reported that Michael was thriving with Mr. and Mrs. V., who were willing to care for him until an adoptive home was located. Mother had completed a parenting class, but had not enrolled in either individual counseling or a drug treatment program. She continued to visit Michael regularly.

At the hearing, the juvenile court found that mother failed to consistently and regularly visit Michael, had not made significant progress in resolving the problems that led to his removal, and did not demonstrate the capacity to complete her case plan. The juvenile court found the permanent plan for Michael was adoption or legal guardianship; it terminated mother's reunification services, granted her monitored visits, and set a section 366.26 hearing for May 16, 2013.

*Placement with Mr. and Mrs. S.*

On April 23, 2013, Michael was placed with prospective adoptive parents, Mr. and Mrs. S.

*Section 366.26 Report and Hearing*

On May 16, 2013, DCFS reported that Michael was adjusting well to his new placement and had not exhibited any behavioral problems. Mother had not visited since April 4, 2013. DCFS reported that the likelihood that Michael would be adopted was "exceedingly high." DCFS requested that the hearing to terminate mother's parental rights be continued to October 16, 2013, to allow time for Mr. and Mrs. S.'s family to get to know Michael.

At the hearing, the juvenile court found the permanent planned living arrangement with Mr. and Mrs. S. appropriate, ordered adoption as Michael's permanent plan, and continued the hearing to October 16, 2013.

*Removal from Mr. and Mrs. S.'s Home*

Following a visit with his father on May 25, 2013, Michael was very upset and cried for "a while." Mr. and Mrs. S. were distressed by the experience and requested that Michael be removed from their home.

On May 29, 2013, Michael was placed with his former foster parents, Mr. and Mrs. V.

*Addendum Report; Continued Hearing*

On October 16, 2013, DCFS reported that Michael had been placed with new prospective adoptive parents on September 24, 2013. He said that he liked the prospective adoptive parents, and he appeared to be bonding with them. They had an approved adoption home study and were looking forward to making Michael a permanent member of their family. DCFS requested that the section 366.26 hearing be continued to allow time for Michael to bond with the prospective adoptive parents.

The juvenile court found that the permanent plan of adoption as appropriate and continued the hearing to February 4, 2014.

*Addendum Report*

On November 8, 2013, the social worker was informed that Michael's prospective adoptive parents were no longer interested in adopting the boy because he had anger issues.

On November 12, 2013, Michael was placed with Mr. and Mrs. K.S. They were "very excited" to be able to adopt Michael, and DCFS reported the likelihood that Michael would be adopted was "high." Michael told the social worker that he liked living at his current placement and did not want to live anywhere else. Mr. and Mrs. K.S. had an approved adoption home study, were experienced with emotionally disturbed children, had previously adopted a child, and were committed to providing permanency for Michael.

*Addendum Report and Contested Section 366.26 Hearing*

On February 4, 2014, DCFS reported that Michael was healthy, clean, and happy, and wanted to remain with Mr. and Mrs. K.S. Mrs. K.S. told the social worker that after

6

visits with mother, Michael would urinate on himself, become fearful of "monsters" in his room, and behave aggressively. She said that Michael told her he did not want to live with mother.

The contested section 366.26 hearing went forward that day. Mother's counsel requested that Michael testify, because mother wanted him to speak about his relationship with her and how he would feel if her parental rights were terminated. Mother's counsel argued that she had a statutory right to cross-examine and confront witnesses and that the court's refusal to call a child as a witness violated due process.

In response to the juvenile court's request for an offer of proof, mother's counsel responded that mother sought to prove the beneficial parent-child relationship exception to the termination of parental rights. (§ 366.26, subd. (c)(1)(B)(i).) Michael would allegedly testify that he loved mother, wanted to see her for the rest of his life, and would be sad if her parental rights were terminated.

Michael's counsel argued that mother had not occupied a parental role in the child's life, and Michael's feelings were not legally relevant with regard to the exception that mother sought to prove.

The juvenile court determined that mother's offer of proof was insufficient, stating that it would be "traumatic" for Michael to testify. Thus, it denied mother's request to call Michael as a witness.

Mother then testified about her visitation with Michael. Following her testimony, mother's counsel argued that she had satisfied the beneficial parent-child relationship exception and asked that her parental rights remain intact; she requested that the juvenile court order a legal guardianship instead of adoption.

Michael's counsel reiterated that mother did not satisfy the elements of this exception.

The juvenile court found that mother did not prove any exception to the termination of parental rights. It terminated parental rights, found that it was likely that Michael would be adopted, identified Mr. and Mrs. K.S. as the child's prospective adoptive parents, and ordered adoption as the permanent plan.

*Appeal*

Mother's timely appeal ensued.

## DISCUSSION

I. *Substantial Evidence Supports the Juvenile Court's Finding that Michael was Adoptable*

Mother argues that no substantial evidence supporting a finding that Michael was adoptable.

At the section 366.26 hearing, the juvenile court is required to select and implement a permanent plan. (*In re Lukas B.* (2000) 79 Cal.App.4th 1145, 1153.) Adoption is the preferred plan. (*Ibid.*; see also *In re Beatrice M.* (1994) 29 Cal.App.4th 1411, 1416.)

Section 366.26 mandates that the juvenile court terminate parental rights if it determines by clear and convincing evidence that the child will likely be adopted. (§ 366.26, subd. (c)(1).) The question of adoptability at the section 366.26 hearing focuses on the minor, "e.g., whether the minor's age, physical condition, and emotional state make it difficult to find a person willing to adopt the minor." (*In re Sarah M.* (1994) 22 Cal.App.4th 1642, 1649.) The fact that a prospective adoptive parent has expressed an interest in adopting the minor "is evidence that the minor's age, physical condition, mental state, and other matters relating to the child are not likely to dissuade individuals from adopting the minor. In other words, a prospective adoptive parent's willingness to adopt generally indicates the minor is likely to be adopted within a reasonable time either by the prospective adoptive parent *or by some other family*." (*Id.* at pp. 1649–1650; see also *In re Jerome D.* (2000) 84 Cal.App.4th 1200, 1205.)

As the parties agree, we review the juvenile court's adoptability finding for substantial evidence. (*In re R.C.* (2008) 169 Cal.App.4th 486, 491.)

Applying this standard of review, we conclude that there was ample evidence to support the juvenile court's finding. There was a family ready, willing, and able to adopt Michael. Mr. and Mrs. K.S. had an approved adoption home study, were experienced with emotionally disturbed children, and were committed to adopting Michael. Michael

was happy and healthy; he liked living with Mr. and Mrs. K.S., and he did not want to live with mother. DCFS characterized the likelihood that Mr. and Mrs. K.S. would adopt Michael as "high."

In spite of this evidence, mother argues that the evidence was insufficient in light of Michael's prior failed placements. While it is true that Michael exhibited behavioral issues throughout this case, there was no indication that he was not adoptable as a result. In fact, Mr. and Mrs. K.S. were well aware of Michael's behavioral issues and remained eager to adopt the boy all the same.

Notably, it was mother who created the conditions that led to Michael's emotional problems, as he was physically abused when with her and his emotional outbursts almost always followed visits with her. We cannot ignore the evidence in the record that Michael, who was otherwise "happy," "calm," and a "joy," would cry uncontrollably, throw tantrums, behave aggressively, have nightmares, and become distant and "irritable" after visits with mother. It was mother who made Michael "regress" and act out. As such, we will not allow mother to use his behavioral issues to prevent him from enjoying the experience of a stable home with parents equipped to tend to his special needs.

The cases cited by mother (*In re Amelia S.* (1991) 229 Cal.App.3d 1060 and *In re Asia L.* (2003) 107 Cal.App.4th 498) are distinguishable because Mr. and Mrs. K.S. were not merely "*considering*" (*In re Amelia S.*, *supra,* at p. 1065) or "willing[] to explore" (*In re Asia L.*, *supra*, at p. 512) adoption; they were firmly committed to adopting Michael and making him a permanent member of the family. They were fully aware of Michael's behavioral issues, had experience working with emotionally disturbed children, and were not dissuaded from their commitment to the child.

II. *The Juvenile Court did not Abuse its Discretion in Declining to Order Michael to Testify at the Section 366.26 Hearing*

Mother contends that her due process rights were violated when the juvenile court refused to have Michael testify at the section 366.26 hearing.

Section 366.26, subdivision (h), provides that the juvenile court must consider the child's wishes to the extent ascertainable prior to terminating parental rights. (See *In re*

*Amanda D.* (1997) 55 Cal.App.4th 813, 820.) However, considering the wishes of the child does not mandate testimony from the child. (*Ibid*.) Instead, evidence can be found in court reports prepared for the hearing. (*Ibid*.)

"[T]he juvenile court . . . may refuse to require the . . . testimony of the child who is the subject of the litigation. This power derives, we believe, from a recognition of the overriding objective of the dependency hearing—to preserve and promote the best interests of the child. It would be a perversion of the procedure to impose upon it a requirement that the child's testimony *always* be presented, regardless of the trauma resulting to the child therefrom, and regardless of the necessity of such testimony in the resolution of the issues before the court." (*In re Jennifer J.* (1992) 8 Cal.App.4th 1080, 1089.) A child may be too young or too frail to testify, or too young to understand or express his or her wishes regarding the proceeding. (*In re Juan H.* (1992) 11 Cal.App.4th 169, 172.)

A juvenile court's determination to exclude the testimony of a child at a section 366.26 hearing is reviewed for abuse of discretion. (*In re Jennifer J.*, *supra*, 8 Cal.App.4th at p. 1088.)

The juvenile court did not err in denying mother's request that Michael testify. (*In re Jennifer J.*, *supra*, 8 Cal.App.4th at p. 1088.) First, ample evidence supports the juvenile court's finding that testifying would have been "traumatic" for Michael. After all, Michael's behavioral issues seemed to be at their worst following Michael's contact with mother. There was no reason to subject him to any more stress and anxiety by having him testify in court. Second, Michael's testimony was unnecessary—the DCFS reports disclosed Michael's desire not to live with mother and the fact that he liked living with Mr. and Mrs. K.S. and did not want to live anywhere else. Third, the issue to be resolved (whether mother could prove the beneficial parent-child relationship exception to termination of parental rights) would not have been materially affected by Michael's testimony; mother was unable to prove the applicable exception and his feelings were not legally relevant. (§ 366.26, subd. (c)(1)(B).)

Mother's reliance upon Evidence Code section 240, subdivision (c), is misplaced. Because Michael was not the victim of a crime, this statute is inapplicable. (*In re Jennifer J.*, *supra*, 8 Cal.App.4th at p. 1088.)

Finally, mother's due process rights were not violated. The juvenile court acted well-within its discretion in denying mother's request that Michael testify. Even if the juvenile court had erred, such error would be deemed harmless because the testimony mother sought to elicit from Michael had no bearing on the exception to the termination of parental rights that mother aimed to prove. In order to establish the beneficial parent-child relationship exception, mother had to establish that she maintained regular visitation and contact with Michael and that Michael would benefit from continuing the relationship. (§ 366.26, subd. (c)(1)(B)(i); *In re Derek W.* (1999) 73 Cal.App.4th 823, 826.) Michael's proposed testimony that he loved mother, wanted to see her for the rest of his life, and would be sad if her parental rights were terminated would have been irrelevant to the two critical questions in the analysis of the application of this exception.

## DISPOSITION

The juvenile court's finding and order are affirmed.

<u>NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS</u>.


_____, Acting P. J.
          ASHMANN-GERST

We concur:


_____, J.
      CHAVEZ


_____, J.
      HOFFSTADT

11